41876. COTTON STATES MUTUAL INSURANCE COMPANY
v. NEESE et al.
(329 SE2d 136)

HILL, Chief Justice.

We granted certiorari to decide whether an exclusion in a policy of automobile insurance, excluding liability coverage while an insured

is "attempting to avoid apprehension or arrest," is unenforceable as a matter of public policy in view of Georgia's compulsory insurance law. The Court of Appeals held that the exclusion is unenforceable. *Cotton States Mut. Ins. Co. v. Neese*, 173 Ga. App. 62 (325 SE2d 431) (1984).

Danny Blalack was killed at about 10:45 a.m. on March 27, 1981, when the car he was driving was struck by a Plymouth Barracuda driven by Christopher Neese. Neese, who was skipping school without permission, and two high school companions riding with him were injured. At the time of the collision, Neese was driving at an excessive speed, attempting to outrun a state patrol car which was pursuing him. The state patrolman had observed the Barracuda traveling above 75 m.p.h. and passing other vehicles in a no passing zone. A high speed chase ensued around sharp curves at speeds reaching approximately 100 m.p.h., terminating in the head-on collision with Blalack's vehicle.

The deceased, Blalack, had no automobile insurance. The Barracuda was insured by Cotton States Mutual Ins. Co. under a policy issued to Neese's father, with bodily injury liability limits of $100,000 per person and $300,000 per occurrence. One of the exclusions to liability coverage is "to any automobile while used by any insured . . . while attempting to avoid apprehension or arrest."[1]

Relying on this exclusion, Cotton States denied coverage and brought suit for declaratory judgment, naming as defendants its insureds, the insured's passengers and their parents, and the widow and estate of the deceased driver of the other vehicle. After a jury verdict finding that Neese was "attempting to avoid apprehension or arrest" at the time of the collision, the trial court found the exclusion to be unenforceable as a matter of public policy, and entered judgment against the insurance company. On appeal, the Court of Appeals affirmed, *Cotton States Mut. Ins. Co. v. Neese*, supra.

We granted certiorari to decide the question stated, and because the insurer urged that the Court of Appeals' opinion could be read broadly to declare all exclusions from liability to be unenforceable. We deal only with the exclusion in issue in this case, but because of the scarcity of cases our analysis contains examples of other exclusions and possible exclusions.[2]

---

[1] The policy contains several exclusions. In pertinent part it provides: "This policy does not apply under Part 1 [Liability]: . . . (K) to any automobile while used by any insured for prearranged or organized drag racing or speed contests, or while attempting to avoid apprehension or arrest."

[2] At the outset, we note that although some states prescribe by statute what exclusions an insurance policy may contain, see *Krempel v. Noltze*, 41 Wis.2d 454 (164 NW2d 227) (1969); *Farmers Ins. Exchange v. Cocking*, 29 Cal.3d 383 (628 P2d 1) 173 Cal.Rptr. 846 (1981); N.Y. Stats Ch. 28, § 5103 (b) (3), Georgia does not.

1. Prior to 1963, liability insurance was purchased in Georgia for the benefit and protection of the insured and his or her assets. Because of the large number of motorists whose assets were limited and who did not have liability insurance, in 1963 the General Assembly adopted an uninsured motorist act which requires that any insurance company issuing or delivering motor vehicle liability policies in this state provide protection to its insureds when injured by the negligence of an uninsured motorist; i.e., the insurance company is required to pay its insured sums which the insured is legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle. A motor vehicle is uninsured if there is no liability insurance on it, or if the insurer of such vehicle legally denies coverage. The law allows the insured to reject uninsured motorist coverage in writing. Ga. L. 1963, p. 588; now OCGA § 33-7-11. As with liability insurance, uninsured motorist protection was for the benefit of the insured, not the driver of a vehicle struck by the insured.

In 1974, the General Assembly enacted the Motor Vehicle Accident Reparations ("no-fault") Act. Ga. L. 1974, p. 113; now OCGA § 33-34-1 et seq. It provides that no insurer shall issue a policy in this state, and no owner of a motor vehicle required to be registered in this state shall operate or authorize another to operate such vehicle, unless, among other things, the policy provides and the owner has bodily injury liability insurance in at least the amount of $10,000 per person in any one accident and $20,000 for two or more persons in any one accident (in 1981, the year in issue here). OCGA §§ 33-34-3, 33-34-4, 40-9-37 (a); *Pearce v. Southern Guaranty Ins. Co.*, 246 Ga. 33, 36-37 (268 SE2d 623) (1980).[3] Thus, when adopting our "no-fault" act in 1974, the General Assembly enacted a compulsory liability insurance law. *Pearce*, supra, 246 Ga. at 36. At this point, liability insurance was required by law not only for the benefit of the insured but to ensure compensation for innocent victims of negligent motorists.

We turn now to the public policy aspects of this case.[4] The insur-

---

[3] These minimums have now been raised to $15,000 per person in any one accident and $30,000 for two or more persons in any one accident. Ga. L. 1983, p. 938.

[4] See OCGA § 13-8-2 (a). In discussing the subject of public policy, Corbin observes that "Our entire body of what is described as the 'common law' is the resultant of innumerable court decisions, based upon the judicial notions of sound social policy and human welfare." 6A Corbin on Contracts, § 1375 at p. 18 (1962). Hence, a contract or a provision thereof may be found by a court to be unenforceable as a matter of public policy based upon a judicial determination of sound social policy and human welfare sufficient to overcome the policy favoring freedom and enforceability of contracts. See Restatement, Contracts 2d, Introduction to Ch. 8, p. 2 (1981). However, "[T]he power of the courts to declare a contract void for being in contravention of a sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt." *Equitable Loan &c. Co. v. Waring*, 117 Ga. 599 (1) (44 SE 320) (1903).

ance policy here in issue does not exclude liability coverage when the insured vehicle is exceeding the speed limit, and such an exclusion would appear to be unenforceable as a matter of public policy.[5] The policy here does exclude coverage while the insured is using an automobile in a prearranged or organized drag racing or speed contest, and such an exclusion does not appear to be void as a matter of public policy, at least under normal organized racing conditions. Hence, we can assume for purposes of this case that there could be some exclusions which would be against public policy, and that other exclusions would not be against public policy. The question is: Is the exclusion in issue here unenforceable as a matter of public policy?[6]

No case involving the validity of this particular exclusion from liability has been cited by the parties and we have found none.[7] In *Anderson v. Southeastern Fidelity Ins. Co.*, 251 Ga. 556 (307 SE2d 499) (1983), we construed the exclusion as to "any racing event, speed contest or exhibition" not to exclude an impromptu "drag race." *Anderson* involved the interpretation of the insurance contract, not the underlying validity of the exclusion itself. However, in construing the contract, we noted two aids to construction: (1) An insurance contract is to be construed against the insurer which drafted it, and (2) the advent of compulsory motor vehicle liability insurance in this state established the public policy that "innocent persons who are injured should have an adequate recourse for the recovery of their damages." 251 Ga. at 557.

In *Young v. Allstate Ins. Co.*, 248 Ga. 350 (282 SE2d 115) (1981), this court held that a provision in an insurance policy, requiring that notice of a lawsuit against the insured be given the insurer, created no defense for the insurer which was not notified of the suit, in light of

---

[5] Similarly, although they apparently have not done so, insurers conceivably could exclude liability incurred in failing to stop at a stop sign, or in running a red light.

[6] Unlike some states, see *Jenkins v. Mayflower Ins. Exchange*, 93 Ariz. 287 (380 P2d 145) (1963); *Nationwide Mut. Ins. Co. v. Roberts*, 261 N.C. 285 (134 SE2d 654) (1964), and *Universal Underwriters Ins. Co. v. American Motorists Ins. Co.*, 541 FSupp., supra, discussed below, Georgia's compulsory insurance law does not contain an omnibus provision which would require liability insurance under all circumstances and hence would appear to prohibit any and all exclusions. Therefore, in Georgia each exclusion must be evaluated individually.

[7] *Smith v. State Farm Mut. Auto. Ins. Co.*, 122 Ga. App. 430 (177 SE2d 195) (1970), involved an exclusion where an insured attempts to "resist arrest or flee from justice." There it was held that the person attempting to outrun a state patrolman was subject to the exclusion in the policy on the car he was driving, and hence he was an "uninsured motorist" within the meaning of the uninsured motorists provisions of the patrolman's insurance policy. The validity of the exclusion, on grounds of public policy, was not in issue.

*Harmon v. American Interinsurance Exchange Co.*, 39 Mich. App. 145 (197 NW2d 307) (1972), involved a similar exclusion (unlawful flight from police) but that case apparently was a suit to recover for collision damage to the insured vehicle which was demolished when the insured's son attempted to outrun police. The court's prompt rejection of the insured's public policy argument is inapposite here.

Georgia's compulsory automobile insurance law (that is to say, the insurance policy requirement of notice was unenforceable as a matter of public policy). In doing so, the court noted (at p. 350): ". . . [F]inancial responsibility laws are enacted for the benefit of the public rather than for the benefit of the insured. Therefore, the failure of the insured to comply with the policy provisions should not defeat the rights of those for whose benefit the law requiring the policy was enacted."

Courts in other jurisdictions considering their compulsory insurance laws have declared policy coverage to be too narrow and exclusions to be unenforceable. In *Nationwide Mut. Ins. Co. v. Roberts*, 261 N.C. 285, (134 SE2d 654) (1964), the court considered whether a person, injured when the insured driver deliberately drove across a sidewalk and crushed him against a stone wall, was injured "by accident" so as to be protected by the driver's insurance. The court found in favor of the injured party, saying (134 SE2d at 659): "The primary purpose of compulsory motor vehicle liability insurance is to compensate innocent victims who have been injured by the negligence of financially irresponsible motorists. Its purpose is not, like that of ordinary insurance, to save harmless the tortfeasor himself. . . . In order to accomplish the objective of the law, the perspective here must be that of the victim and not that of the aggressor. . . ."[8] See also *Jenkins v. Mayflower Ins. Exchange*, 93 Ariz. 287 (380 P2d 145) (1963), where the court invalidated a restrictive endorsement which precluded recovery when the car was being driven by a member of the armed forces other than the named insured.

In *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Parker*, 320 SE2d 458 (S.C. App. 1984), the court held the "used for business or commercial purposes" exclusion in a policy on a pickup truck loaned by the owner to his son, and being used in the son's roofing business when the accident occurred, was void on grounds of public policy. See also *Universal Underwriters Ins. Co. v. American Motorists Ins. Co.*, 541 FSupp. 755 (N.D. Miss. 1982), where the court, construing Mississippi law, held the "automobile business" exclusion to be invalid.

In *Mut. of Enumclaw Ins. Co. v. Wiscomb*, 97 Wash.2d 203 (643 P2d 441) (1982), the court held a liability insurance policy provision excluding protection of members of the insured's family residing in the same household to be void as against public policy. (The Washington court had previously abrogated intrafamily tort immunity.)

In *Weekes v. Atlantic Nat. Ins. Co.*, 370 F2d 264, 272 (9th Cir. 1966), the court, construing Arizona law, invalidated a rent-a-car lia-

---

[8] See also *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Miller*, 185 N.J. Super. 183 (447 A2d 1344) (1982).

bility insurance provision excluding coverage while the vehicle was being operated by a person under the influence of intoxicants.

Against this growing body of law, the insurer cites *Harbin v. Sams*, 171 Ga. App. 263 (319 SE2d 99) (1984) (family exclusion clause); *Patterson v. Commercial Union Ins. Co.*, 151 Ga. App. 86 (258 SE2d 748) (1979); *Allstate Ins. Co. v. Skinner*, 150 Ga. App. 106 (257 SE2d 4) (1979) (member of the household exclusion); and *Standard Guaranty Ins. Co. v. Davis*, 145 Ga. App. 147 (243 SE2d 531) (1978), as being contrary to the holding of the Court of Appeals in this case. None of those cases involved the exclusion in issue here, and as indicated each exclusion must be evaluated individually.

The insurer cites *Greenwood Cemetery, Inc. v. Travelers Indem. Co.*, 238 Ga. 313, 316 (232 SE2d 910) (1977), for the proposition that courts cannot declare agreements authorized by statute to be contrary to public policy, and urges that OCGA § 33-7-11 (b) (1) (D) (iii) authorizes the exclusion here in issue. That subsection, part of our uninsured motorist law, defines an uninsured motor vehicle to include one which is insured but as to which "the insurance company writing the insurance has legally denied coverage under its policy." The insurer argues that this provision shows that exclusions in liability policies are valid and, therefore cannot contravene public policy. We note first that this provision does not refer to exclusions; it refers to the legal denial of coverage. Such denial of coverage could arise from an exclusion or it could arise from the failure of the insured to cooperate or give notice. But see *Young v. Allstate Ins. Co.*, supra. Secondly, the insurer's argument would validate exclusions as to exceeding the speed limit, going through a stop sign, running a red light, and driving while under the influence of intoxicants, — results we could possibly find unacceptable. Therefore, we find that OCGA § 33-7-11 (b) (1) (D) (iii), supra, does not have the effect of rendering the exclusion in issue here immune from judicial scrutiny.[9]

In the case before us, there are five competing interests present, the interests of (1) the insurance company, (2) its insureds, (3) the public, and those members of the public directly involved here, (4) the insured's passengers and (5) the estate and widow of the deceased driver of the other vehicle. Excluding the public, the interests of the identified parties are self-evident, with the insureds, the insured's passengers, and the deceased being aligned against the insurer. However, when considering a question of public policy, we focus primarily

---

[9] The rule is well established: A person may waive or renounce what the law has established in his favor, when he does not thereby injure others or affect the public interest, but laws made for the preservation of public order, or good morals, cannot be done away with or abrogated by agreement. *Hughes v. State*, 159 Ga. 818 (3) (127 SE 109) (1925), and cases cited.

on the interests of the public. Its identifiable interests in this case are at least threefold: (1) as insureds, to limit the insurer's risks and thereby keep automobile insurance premiums as low as possible; (2) as members of the public in general to improve safety on the highways; and (3) as accident victims, to have access to insurance funds to satisfy their judgments. The exclusion in issue here serves the first of these interests, but the record contains no information as to the extent that interest is served.[10] Although the insurer urges that its exclusion promotes safety on the highways by deterring its insureds from fleeing from police, it offers nothing to show that such fleeing is actually deterred at the time the decision to flee is made or during the flight, and post-collision denial of liability coverage clearly was an ineffective deterrent in the case before us. The exclusion is directly contrary to the third public interest, and our compulsory insurance law was enacted to serve that very interest.

Balancing the interests involved and recognizing that our compulsory insurance law established the public policy that "innocent persons who are injured should have an adequate recourse for the recovery of their damages," *Anderson v. Southeastern Fidelity Ins. Co.,* supra,[11] and viewing this unnecessary accident from the standpoint of the deceased driver of the other vehicle involved, *Nationwide Mut. Ins. Co. v. Roberts,* supra, we hold that the exclusion in issue here is unenforceable on grounds of public policy as to the deceased, Danny Blalack, who was merely driving on the roadway when he was struck head on by a speeding vehicle driven by Christopher Neese.[12]

In so holding, we are aware that Danny Blalack had no automobile insurance. Thus, he had no uninsured motorist coverage. Even if he had had liability insurance, under our law he could have chosen not to purchase uninsured motorist protection.[13]

2. However, we conclude that the exclusion in issue is unenforceable as against public policy only to the extent of insurance required

---

[10] The scarcity of cases involving the "fleeing to avoid arrest" exclusion suggests that such an exclusion is not considered essential by some insurance companies, or is involved in only a very few accidents, or both. In any event, such scarcity lessens the weight to be attributed to the first of the public's interests.

[11] In writing the opinion for the court in *Anderson,* Justice Weltner, our philologist, used the word "should," not "shall."

[12] Cotton States criticizes the Court of Appeals' opinion for characterizing Blalack as an innocent victim of the collision, saying that no negligence by Neese has yet been established and Blalack was violating the law by driving without insurance. We assume for purpose of this decision that Blalack was not driving negligently; certainly Cotton States has not established that he was negligent or that such negligence was the proximate cause of the accident. Under such circumstances, Blalack may be considered as the innocent victim of the collision notwithstanding the fact that he had no liability insurance.

[13] We leave to a proper case the question of whether the existence of uninsured motorist coverage would affect the outcome in such a case.

by our compulsory insurance law at the time of the collision; that was $10,000 per person in any one accident and $20,000 for two or more persons in any one accident. The compulsory insurance law required that these sums be available to compensate injured motorists; it required no more. To the extent that the Barracuda was insured for greater sums, such insurance was purchased for the protection of the insureds, and although the wrongful death defendants may be liable for more, their insurer is entitled to rely on the exclusion as to sums above those required by our compulsory insurance law. That is to say, the compulsory insurance law does not establish public policy as to sums greater than those required by such law. *Weeks v. Atlantic Nat. Ins. Co.*, supra, 370 F2d at 272-273; *Universal Underwriters Ins. Co. v. American Motorists Ins. Co.*, supra, 541 FSupp. at 761.

3. We turn now to the claims of the two passengers in the Barracuda. Like the driver of the other vehicle, they may have been suddenly caught in an unexpected situation and thus be innocent victims injured in the collision. On the other hand, they may have been willing participants in the attempt to elude the pursuing patrolman. If the latter be the case, the public policy created by our compulsory insurance law does not favor them. Therefore, unless one or both of the passengers in the fleeing vehicle can demonstrate to the trier of fact by a preponderance of the evidence that he or they did not encourage or participate in the attempt to avoid apprehension or arrest, the exclusion is enforceable as to them.

Placing the burden of proof upon the passengers in the fleeing vehicle is consistent with the burden placed upon them to recover for their personal injuries, is consistent with the reasonable expectation that passengers are likely under such circumstances to share the driver's excitement and assist him in attempting to escape, and is consistent with the policy of declining to reward those who aid and abet drivers who attempt to outrun policemen. If either or both passengers satisfy this burden, the same public policy which favored the driver of the other vehicle favors the innocent passenger or passengers.

We therefore affirm in part and reverse in part Division 2 of the Court of Appeals' decision.

*Judgment affirmed in part; reversed in part. All the Justices concur, except Marshall, P. J., and Gregory, J., who concur specially, and Smith, J., who dissents.*

GREGORY, Justice, concurring specially.

I concur fully in the judgment and the language of Divisions 1 and 2 of the majority opinion. However, I differ with the rationale of Division 3. I view the driver and the passengers as standing in entirely different positions with regard to the question of coverage. The

driver is an insured under the policy who has called on the insurer to defend tort actions against him arising out of his use of the vehicle. The driver's conduct is relevant to two separate issues. Since the policy under which he claims coverage does not apply to "any automobile while used by an insured . . . while attempting to avoid apprehension or arrest," his conduct may cost him the coverage he seeks, or part of that coverage under our decision here. His conduct is also relevant, of course, on the issue of liability in the tort actions. The passengers are not defendants in a tort suit. They do not seek coverage under the policy. They are plaintiffs in a tort suit against the driver. Their conduct is relevant to the issue of liability in that action but is not relevant to the issue of coverage. I view the passengers and the victim in the other vehicle as being similarly situated as to the issue of coverage. As to all of them, their conduct has everything to do with liability and nothing to do with coverage.

I am authorized to state that Presiding Justice Marshall joins in this special concurrence.

SMITH, Justice, dissenting.

The majority's use of our compulsory automobile liability insurance laws as a bar to recovery of any excess coverage by victims and as a bar to excess protection by insureds is a mystery to me.

I believe that the public policy of the State of Georgia is to encourage drivers to be financially responsible by requiring certain *minimum liability insurance coverage*, OCGA § 33-34-4, and to further encourage drivers to protect *themselves and others by obtaining more than the mere statutory minimum amounts*, OCGA § 33-34-5.

As the majority notes, prior to 1963 liability insurance was purchased by the insured for the benefit and protection of his or her assets. That is no less true today than it was then. In 1963 the legislature enacted an uninsured motorist act, Ga. L. 1963, p. 588; now OCGA § 33-7-11, to encourage insured drivers to carry additional protection from the negligent uninsured. The statute states in part, "No automobile liability policy . . . shall be issued or delivered in this state . . . unless it contains an endorsement or provisions undertaking *to pay the insured* all sums which he shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle . . ." (Emphasis supplied.) Apparently the legislature was so intent on protecting the insured that it required any rejection of the minimum coverage to be in writing. OCGA § 33-7-11 (3). The legislature's intention can only be seen as encouraging the already financially responsible driver to obtain additional protection.

In 1974 the legislature enacted the "no-fault" insurance act, Ga. L. 1974, p. 113; now OCGA § 33-34-1 et seq. Although the advent of compulsory motor vehicle liability insurance may have established a

public policy of providing that "innocent persons who are injured should have an adequate recourse for the recovery of their damages. [Cit.]" *Anderson v. Southeastern Fidelity Ins. Co.*, 251 Ga. 556, 557 (307 SE2d 499) (1983), it did not change what I perceive to be the public policy of this state to encourage financially responsible drivers to protect *themselves and others.*

The addition of the "no-fault" law was not designed only to protect the victims, otherwise the legislature would not have stated, "Nothing in Code Sections 33-34-4 and 33-34-5 shall be construed to prohibit the issuance of policies providing coverage more extensive than the minimum coverage required by those Code sections." OCGA § 33-34-3 (b). The legislative intent of promoting greater financial responsibility is even clearer when we look at the wording of OCGA § 33-34-5 which states in part, "Each insurer *shall* also make available on an optional basis the following coverage: (1) An aggregate limit of benefits payable without regard to fault up to $50,000 per person." Insurers have a statutory obligation to offer the optional coverage, which is well above the lowest part of our statutory minimum in OCGA § 33-34-4. The legislature very wisely has indicated a position of encouraging the financially responsible driver to be insured beyond the mere minimum coverage required. This is a policy that benefits everyone, the insured, the innocent victims, and the public.

Apparently the states of Arizona and Mississippi, as viewed through the eyes of two federal courts, do not share in the wisdom of our legislature. Both states have similar statutes. The Mississippi statute provides, "[A]ny policy which grants the coverage required for a motor vehicle liability policy may also grant lawful coverage in excess of or in addition to the coverage specified for a motor vehicle liability policy, and such excess or additional coverage shall not be subject to the provisions of this chapter." *Universal Underwriters Ins. Co. v. American Motorists Ins. Co.*, 541 FSupp. 755, 760 (1982) citing Section 63-15-43, Subsection 7 of the Mississippi Code Annotated. The federal court found that "Subsection 7 expressly exempts such excess or additional coverage from the provisions of the state's Financial Responsibility Act." Id. at p. 761. A similar result was reached by the other federal court based on the wording of the Arizona statute. *Weekes v. Atlantic Nat. Ins. Co.*, 370 F2d 264, 273 (9th Cir. 1966).

Our statute is not similar to the one in Arizona or Mississippi. Our statute encourages additional coverage. Where their statutes provide that additional coverage *may* be granted, our statute provides that insurers *shall* make optional coverage available. OCGA § 33-34-5. Their statute specifically exempts excess coverage and our statute provides that nothing in §§ 33-34-4 and 33-4-5 shall be construed to prohibit excess coverage. OCGA § 33-34-3 (b). We are not bound by

federal court's interpretation of other state's statutes. We interpret our own statutes, and it seems clear to me that we encourage additional coverage.

The legislature wisely enacted OCGA § 33-34-4 to provide for *minimum required coverage for all drivers*, it was not intended to become a barrier for those insureds who purchased additional protection, nor was it intended to become a barrier for victims who happen to be involved with an insured who had excess coverage available.

The majority stated in Division 1 that the exclusion is "unenforceable on grounds of public policy as to the deceased, . . ." Once the majority declared the exclusion unenforceable on grounds of public policy it could not legally declare that it was enforceable only up to the statutory limit. " 'No court can properly concern itself with the enforcement of a contract which is contrary to public policy and for that reason void, nor with the adjustment of alleged rights or equities growing out of such a contract. This doctrine is so thoroughly established and so universally recognized that it will not, we apprehend, be questioned; but it has evidently been too often overlooked by the courts in their efforts to do what they conceived to be "justice." ' *Exchange Bank of Macon v. Loh*, 104 Ga. 446, 459 (31 SE 450)." *Gordon v. Gulf American Fire &c. Co.*, 113 Ga. App. 755, 760 (149 SE2d 725) (1966). Not only has the court concerned itself with an exclusion it found against public policy, it has found that the insured and the victim will only be allowed to rely on the lowest statutory minimum, OCGA § 33-34-4, rather than the optional coverage which was *required to be offered*, OCGA § 33-34-5.

2. The question before this court when the case came to us on certiorari was whether or not the exclusionary clause was void. Somehow the majority has gone beyond that question in Division 3 by turning to the "claims of the two passengers." There was no question of "claims of the two passengers" before us.

A contract of insurance is between the insured and the insurer. Subsequent acts of either party may affect the contract, but the acts of a party not privy to the contract should have no bearing on the contract. As regards the insurance policy, there is either coverage or there is not. Once the majority decided that the exclusion was against public policy, there was coverage. Not only has the majority addressed a question that was not before us, it has confused the issue of contractual coverage and the tort concept of assumption of the risk. As cited above, this court had no business trying to involve itself with adjusting the equities involved once it found that the clause was unenforceable as against public policy.

DECIDED APRIL 30, 1985 —
REHEARING DENIED MAY 21, 1985.

E. Wycliffe Orr, for appellant.

C. Michael Roach, Nicholas E. Bakatsas, James D. Hogan, Jr., for appellees.